656 So.2d 441 (1995)
Joseph BESARABA, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 80016.
Supreme Court of Florida.
May 4, 1995.
Rehearing Denied June 29, 1995.
*442 Richard L. Jorandby, Public Defender, and Jeffrey L. Anderson, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Sara D. Baggett, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Joseph Besaraba. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Joseph Besaraba, a homeless person, was riding a local bus on July 23, 1989, near the Fort Lauderdale/Hollywood International Airport when the bus driver, Sidney Granger, stopped the vehicle at approximately 11:15 a.m. and approached Besaraba. The driver yelled at Besaraba, accusing him of drinking an alcoholic beverage on the bus, and told him to either dispose of the beverage or get off the bus. Besaraba remained calm, but left the bus. Besaraba then rode another bus to the Young Circle transfer site in Hollywood, and sat on a bench. After approximately a half-hour, Granger's bus pulled into the site. Besaraba walked up to Granger's bus with a drawn handgun, fired a volley into the side of the bus, walked to the front door and fired a shot into Granger's neck, killing him. Besaraba then fired another shot into passenger Wesley Anderson's back, killing him. Besaraba walked away from the transfer site, approached a car waiting at a red light, and ordered the driver, Scott Yaguda, out of the vehicle. As Yaguda walked away, Besaraba shot him in the back three times. Yaguda did not die. Besaraba left the scene in Yaguda's car, and was captured three days later in Nebraska following a struggle in which Besaraba tried to pull his gun on two officers.
Besaraba was charged with robbery, attempted murder, possession of a firearm during commission of a felony, and two counts of first-degree murder. During the guilt phase of the capital trial, Dr. James Concannon, an expert in the field of psycho-pharmacology, testified that Besaraba has a history of the following: moderate to serious memory problems; paranoid tendencies; organic brain damage; hospital treatment for numerous physical and mental conditions; psychotic or paranoid behavior; alcohol counseling; and delirium. Dr. Concannon testified that Besaraba also participated as a subject in numerous drug tests conducted by pharmaceutical laboratories. After the jury retired, Besaraba read a statement based on voices he had heard:
I've been under surveillance for at least 35 years by government agents, almost *443 certainly the FBI. During this 35 years of surveillance chemical substances were used on me, Joseph Besaraba, for unknown reasons or purposes.
These chemicals were illegally and unknowingly foisted upon me, Joseph Besaraba, on the morning of July 23rd, 1989, before the murders in Young Circle....
These government agents kept records and files of this surveillance and of the types and dosages they used on me, Joseph Besaraba. These files or records would prove my innocence and expose the wrongdoing and illegal acts of the government agents.
I request under the Freedom of Information Act any file the FBI or other agency of the United States have on me, Joseph Besaraba, not admitting to or giving me access to these files.
Besaraba was convicted on all counts.
During the penalty phase, Besaraba's father testified that the family came to the United States in 1949 when Joseph was five years old, after the father spent years as a member of the Polish underground eluding first the Nazis and then the Communists. When Joseph was eighteen, his sister, who was twenty, died of a brain tumor after suffering for two years. Shortly thereafter, Joseph seriously injured his head in a car accident, was unconscious for two days, and spent six weeks in the hospital. Afterwards, Joseph began acting strangely and talking nonsense, and his parents had him hospitalized again. Joseph believed the "underground" was after him, and complained to his father that a neighbor was putting poison on his furniture. Besaraba's mother died in an automobile accident while visiting Poland.
Other friends, acquaintances, and experts testified in Besaraba's favor. Dr. Ross Seligson, a psychiatrist, testified that Besaraba has a history of the following: alcoholic hepatitis; spitting up blood; weight loss and malnourishment; extensive alcohol abuse; sleep apnea; paranoid schizophrenia; paranoid ideas that people are after him; probable organic brain syndrome; bizarre delusions; hallucinations; and a family history of mental illness and alcoholism.
The jury voted seven to five for death, and the court imposed the death penalty in each first-degree murder count after finding two aggravating circumstances,[1] two statutory mitigating circumstances,[2] and three nonstatutory mitigating circumstances.[3] The court arrested judgment on the offense of carrying a firearm during commission of a felony, and imposed consecutive life sentences on the robbery and attempted murder charges. Besaraba appeals his convictions and sentences, raising twenty-eight issues.[4]
*444 Besaraba first claims that the court erred in finding that the murders were committed in a cold, calculated, and premeditated manner. The trial court found this factor present based on reasons paraphrased below:
 Besaraba was highly familiar with the county bus routes and schedules.
 After Besaraba exited Granger's bus following the confrontation, Besaraba reversed his northerly direction of travel and caught a bus travelling south toward Young Circle Bus Terminal.
 Besaraba waited at Young Circle, where Granger's bus would eventually arrive and have to stop.
 During Besaraba's half-hour wait at Young Circle, four other buses arrived at the terminal but he did not approach any of these buses.
 When Granger's bus arrived, Besaraba walked up to the bus with gun drawn and fired several times at close range in a deliberate manner.
This Court has held that to support this aggravating circumstance the evidence must show a heightened level of premeditation, as in a careful plan or prearranged design:
Simple premeditation of the type necessary to support a conviction for first-degree murder is not sufficient to sustain a finding that a killing was committed in a cold, calculated, and premeditated manner. A heightened form of premeditation is required which can be demonstrated by the manner of the killing. To achieve this heightened level of premeditation, the evidence must indicate that a defendant's actions were accomplished in a calculated manner, i.e., by a careful plan or a prearranged design to kill.
Holton v. State, 573 So.2d 284, 292 (Fla. 1990) (citations omitted), cert. denied, 500 U.S. 960, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991). We conclude that the evidence contained in this record is insufficient to prove the presence of this factor beyond a reasonable doubt.
The record shows that when Besaraba exited Granger's northbound bus after Granger yelled at him for drinking, Granger had at that time stopped the bus not far from the entrance to the Fort Lauderdale/Hollywood airport in an area that was not a designated stop, at 11:15 Sunday morning. By the time Gregory Austing's southbound bus picked Besaraba up an hour and fifteen minutes later, Besaraba had walked to a marked bus stop near the airport entrance in an area described as "desolate."
According to the bus schedule, Gregory Austing's bus was traveling directly behind Granger's bus on Bus Route 1 that day, at a forty minute interval. Thus, forty minutes before Austing picked up Besaraba at the stop outside the airport, Granger's bus had passed that very stop on its southbound return run. No other intervening buses travelled that portion of the route during this period.
The fact that Besaraba changed direction following his confrontation with Granger does not necessarily show that Besaraba was implementing a plan to kill Granger. Had he planned to do so, he could have confronted Granger at the bus stop outside the airport  an isolated stop in a remote area. Rather, the evidence just as likely shows that Besaraba changed direction based on a spur of the moment decision, or perhaps simply took the first bus in any direction out of a desolate area. We note that when Austing's southbound bus picked Besaraba up, Besaraba was in fact standing at a stop in the northbound lane.
Further, the record shows that when Besaraba boarded Austing's bus, he did not buy a ticket, but rather purchased a "transfer." A ticket, which cost seventy-five cents, would *445 have allowed Besaraba to travel south to Young Circle or to any other point on northsouth Bus Route 1, which both Granger and Austing were travelling that day. A transfer, on the other hand, cost eighty-five cents and served the function of two tickets. It would have allowed Besaraba first to travel to any point on Bus Route 1, such as Young Circle, and then to transfer to, and travel on, any interconnecting bus route within a two-hour period. For example, Besaraba could have transferred to a route running in an east-west direction.
The fact that Besaraba purchased a transfer indicates that he planned to take another bus going in a different direction after exiting Austing's bus at Young Circle and may have been waiting for such a bus when Granger's bus pulled into the terminal. Although four buses passed through Young Circle during the half-hour Besaraba was waiting there, a total of 102 buses were scheduled to pass through the terminal that day serving five separate routes, and it is entirely possible that Besaraba's desired bus had not yet arrived.
Finally, the random nature of Besaraba's acts during the crimes belies a careful plan. Besaraba's immediate response when he saw Granger's bus pull into the terminal is not apparent in the record, but we do know that Besaraba promptly approached the bus, gun in hand, fired into the side of the bus, walked to the front door, shot Granger, turned slightly, shot Anderson, walked a short distance to Scott Yaguda's car, ordered him out, shot him three times, and then drove away in Yaguda's car. The shootings of Anderson and Yaguda were entirely indiscriminate; neither person posed a threat of any kind to Besaraba or acted to interfere in his actions. Each was shot in the back. Besaraba's acts were undertaken in front of numerous witnesses and he made no attempt to conceal his identity. When he fled, he left two duffel bags behind in the terminal containing numerous personal items that could be linked to him.
Additionally, the court found the presence of strong mental health mitigating circumstances that weigh against the formulating of a careful plan to kill Granger. The court wrote extensively on this in its sentencing order:
The crimes for which the Defendant is to be sentenced were committed while he was under the influence of great mental or emotional disturbance.
....
The Defendant presented the testimony of Dr. M. Ross Seligson, a psychologist. The doctor stated that at the time of the murders, the Defendant was experiencing a psychotic episode and was unaware of his actions. The situational stress of the prior confrontation between the Defendant and the victim Sydney [sic] Granger caused the Defendant to be publicly humiliated and this triggered the episode. Dr. Seligson also stated that the Defendant's weakened physical state at the time of the murders caused him to be emotionally disturbed.
Evidence of the Defendant's past emotional disturbances was presented. A letter sent to Mr. Besaraba, Sr. from the Defendant in November 1987 was introduced into evidence at the Penalty Phase of the trial. In the letter, the Defendant told his father that the FBI was trying to poison him by spreading chemicals on his clothes and furniture.
Further, the Defendant telephoned his former employer Lawrence Grupp in 1987. He asked Grupp to send money so that he could get out of town because someone was after him. A past friend, Gerard Scullian, testified that he also received a phone call in 1987. The Defendant asked Scullian for money stating that "it was a matter of life or death" although never informing either witness who was after him or why.
Mr. Scullian also described the Defendant as having a "persecution complex." When walking together one afternoon, the Defendant crouched behind Mr. Scullian when a man walking past said hello to the Defendant. The Defendant told Mr. Scullian, "That was one of them." When asked for an explanation, the Defendant could not recall the incident.
Additional evidence relied on by the Defendant to establish this circumstance was that he used alcohol on the day in question. There was a confrontation with Sydney *446 Granger, the bus driver, because Granger accused the Defendant of drinking alcohol on the bus. A witness testified that he sat next to the Defendant at Young Circle... . The witness saw the Defendant drinking from a bottle wrapped in a paper bag.
During an investigation of the scene of the murders, a bottle of partially consumed whiskey in a paper bag was found packed in the Defendant's abandoned duffel bag at Young Circle... .
....
The presence of some alcohol consumption at the time of the crime, without more, does not require a finding that the Defendant was intoxicated. Nevertheless, the Court does find that the Defendant did consume alcohol prior to, and at the time of, the murders. The Defendant was thrown off of Granger's bus for drinking alcohol and a witness observed him drinking just prior to the murders.
The evidence in this record does not show beyond a reasonable doubt that Besaraba concocted a careful plan to kill Granger at Young Circle. Although the record may reflect a suspicion that such a plan existed, this is insufficient to support this aggravating circumstance. Lloyd v. State, 524 So.2d 396 (Fla. 1988). Based on the bus routes and schedules, Besaraba's actions including his purchase of a transfer rather than a ticket, and extensive unrefuted evidence of Besaraba's mental illness, we conclude that it is plausible that Besaraba acted impulsively in planning his route that day and that his mind snapped when he saw Granger's bus pull up to his bench at the transfer site. Besaraba may well have thought that Granger, like many other of his phantom assailants, was pursuing him in order to hurt him. We strike this aggravating circumstance.
Besaraba next claims that the trial court erred in failing to find his unstable and deprived childhood as a mitigating factor. We agree. We ruled in Campbell v. State, 571 So.2d 415, 419 (Fla. 1990), that "[t]he court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence." The record shows that Besaraba's father was a member of the Polish underground during World War II, was captured by, escaped from, and was recaptured by the Nazis, and was forced to work as a slave laborer in Germany. The family lived with him in Germany, subsisting on starvation rations. The defendant was born in captivity in December 1944.
The family left Germany and returned to Poland at the conclusion of World War II. The situation there, however, was intolerable under the Communists because the father refused to join the Communist Party, and the family secretly left Poland and emigrated to the American zone in Germany, sneaking past borders guarded by machine guns and barbed wire. The journey took the family two months on foot. The family lived in an internment camp in Germany for two years under highly restricted conditions. Dr. Seligson testified that it was these deprived and highly dangerous conditions during Besaraba's formative years that instilled the dominant paranoid delusion that he was in peril and was being followed, watched, and persecuted. We find this mitigating circumstance established by the greater weight of the evidence.
Besaraba argues that the death penalty is disproportionate in this case. We agree. Striking the cold, calculated and premeditated circumstance leaves a single aggravating factor  the commission of another capital offense or felony involving use or threat of violence. This Court recently addressed the issue of a single aggravating circumstance:
Long ago we stressed that the death penalty was to be reserved for the least mitigated and most aggravated of murders. To secure that goal and to protect against arbitrary imposition of the death penalty, we view each case in light of others to make sure the ultimate punishment is appropriate.
... We have in the past affirmed death sentences that were supported by only one aggravating factor, but those cases involved either nothing or very little in mitigation.
*447 Songer v. State, 544 So.2d 1010, 1011 (Fla. 1989) (citations omitted).
The present case involves vast mitigation. The trial court found two statutory mitigating circumstances: that the defendant has no significant history of prior criminal activity, and that the crimes were committed while the defendant was under the influence of great mental or emotional disturbance. The court found several nonstatutory mitigating circumstances: that the defendant has a history of alcohol and drug abuse and physical and emotional problems; the defendant has a record of good character and reliable employment; and the defendant has a record of good behavior in prison. Additionally, as noted above, the record establishes that the defendant had a badly deprived and unstable childhood. Accordingly, under our caselaw, the death sentence is disproportionate here.[5]
Based on the foregoing, we affirm all the convictions and the life sentences on the robbery and attempted murder charges. We vacate the death sentences and remand for imposition of life sentences without the possibility of parole for twenty-five years on the murder counts.
It is so ordered.
OVERTON, SHAW, KOGAN and ANSTEAD, JJ., concur.
HARDING, J., concurs in part and dissents in part with an opinion, in which GRIMES, C.J., and WELLS, J., concur.
HARDING, Justice, concurring in part, dissenting in part.
I concur with the majority opinion affirming the defendant's guilt. However, I disagree with the majority's conclusion that the aggravating factor that Besaraba committed the murder in a cold, calculated, and premeditated manner should be stricken. In a very comprehensive and well written sentencing order the trial judge set forth the reasons for finding the murder was committed in a cold, calculated, and premeditated manner:
2. This Court finds beyond a reasonable doubt that the capital felony for which the Defendant is to be sentenced was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. This aggravating circumstance applies when the crime exhibits a heightened premeditation beyond that which is required for a conviction at the trial on First Degree Murder, Jent v. State, 408 So.2d 1024 (Fla. 1981).
Such heightened premeditation can be demonstrated by evidence which shows that the Defendant planned or prearranged to commit murder before the crime began. Rogers v. State, 511 So.2d 526 (Fla. 1987); Hamblen v. State, 527 So.2d 800 (Fla. 1988); Thompson v. State, 565 So.2d 1311 (Fla. 1990). The evidence in the case at bar established a heightened premeditated and a calculated or prearranged design to murder Sydney [sic] Granger. The Defendant's murder of Sydney [sic] Granger and Wesley Anderson was not a random act.
The evidence showed that there was an initial confrontation on the bus between the Defendant and the bus driver, Sidney Granger. From this point until the time of the murders, the Defendant engaged in a series of actions over a period of approximately two hours which demonstrate a cold, calculated and heightened premeditated design to murder Sidney Granger.
The Defendant was extremely familiar with the Broward County bus system and it's [sic] many bus routes. Stacks of bus schedules from Dade, Broward and Palm Beach Counties were found with the Defendant at the time of his capture and among his belongings left behind at the bus shelter.
On the day of the murders, Sidney Granger was driving his bus in a northerly direction on U.S. 1. Granger stopped because he believed the Defendant was drinking alcohol on the bus. The Defendant refused to get rid of the drink and chose to get off the bus after a verbal exchange with Granger.
Thereafter, the Defendant reversed his northerly direction of travel and began traveling south. He traveled back to the *448 Young Circle Bus Terminal in the city of Hollywood, Florida. He waited there for Granger's bus to arrive knowing that this was a place where the bus must stop. Prior to Granger's arrival, four other buses arrived at the terminal but the Defendant did not approach or fire at or into any of these buses.
When Granger's bus finally arrived, the Defendant walked up to that bus with his gun drawn. He fired shots at the outside of the bus, into the side panel and through a bus window. The Defendant then went to the front door of the bus and fired his gun inside.
One shot was fired into Granger's throat at very close range, another into Wesley Anderson's back, also at close range. The Defendant then walked calmly away from the bus and down the street to Scott Yaguda's car where Yaguda was waiting at a traffic light. At gun point, the Defendant ordered Yaguda to get out and give him the car stating, "I've just killed two people, ... I'll kill you too." As Scott Yaguda walked away, the Defendant shot him in the back three times at point-blank range. The Defendant then fled the scene in Yaguda's car.
This type of behavior satisfies the requirement of highly premeditated conduct by the Defendant. Phillips v. State, 476 So.2d 194 (Fla. 1985). The heightened premeditation does not have to be directed toward a specific victim so long as the evidence shows that the Defendant planned or prearranged to commit murder before the crime began. Provenzano v. State, 497 So.2d 1177 (Fla. 1986). Wesley Anderson may not initially have been the Defendant's intended victim, but in the course of the premeditated murder of Granger, he became a victim as a matter of circumstance.
The killings were committed in a "cold manner", without any emotion or passion. There was no evidence that the Defendant's acts were prompted by wild emotion. Rather, the evidence established the Defendant's mental state to be highly unemotional and contemplative. There was a substantial period of reflection and thought by the Defendant followed by a particularly lengthy and methodical planning period. There was no pretense of moral or legal justification for the Defendant's conduct.
I agree with the trial judge that there was sufficient evidence to find beyond a reasonable doubt that the cold, calculated, and premeditated aggravating factor exists. Accordingly, I would affirm the sentence of death imposed by the trial judge.
GRIMES, C.J., and WELLS, J., concur.
NOTES
[1] The court found that the following aggravating circumstances were present: that Besaraba had been previously convicted of another capital offense or a felony involving use of force; and that the murders were committed in a cold, calculated, and premeditated manner.
[2] The court found that the following statutory mitigating circumstances were present: that Besaraba has no significant history of prior criminal activity; and that the murders were committed while Besaraba was under the influence of great mental or emotional disturbance.
[3] The court found that the following nonstatutory mitigating circumstances were present: that Besaraba had a history of alcohol/drug usage and physical and emotional problems; Besaraba had a record of good character and reliable employment; Besaraba had a record of good conduct in prison.
[4] Besaraba claims the court erred in addressing the following matters: 1) in finding that the murder was cold, calculated, and premeditated; 2) in failing to find appellant's unstable and disadvantaged childhood as a mitigating factor; 3) death is disproportionate; 4) in allowing jury instructions requiring "extreme" mental or emotional disturbance and "substantial" impairment; 5) in giving a flight instruction; 6) in admitting evidence of Officer Jara's state of mind; 7) in admitting collateral crime evidence; 8) in finding the prior violent felony aggravator for contemporaneous crimes; 9) a recommendation of death by a vote of seven to five is unconstitutional; 10) in denying's appellants motion to strike the jury panel; 11) in denying appellant's motion to strike evidence where the prosecutor violated the rule of sequestration; 12) in failing to find whether the state's failure to give proper notice of intent to use collateral crime evidence was wilful; 13) in permitting the prosecutor to violate his stipulation that videotaped testimony of Scott Yaguda would be used instead of live testimony; 14) the prosecutor's statements in closing; 15) the prosecutor's comments to the jury during sentencing; 16) in allowing use of nonstatutory aggravating circumstances; 17) in giving the instruction on premeditated murder; 18) in denying appellant's requested instruction on reasonable doubt; 19) in denying appellant's requested instruction that if a mitigating circumstance is found it cannot be given no weight; 20) in failing to adequately define nonstatutory mitigating circumstances; 21) in instructing the jury on CCP; 22) in denying appellant's requested instruction that mitigating evidence does not have to be found unanimously; 23) in failing to instruct on the correct burden of proof in the penalty phase; 24) appellant was denied his rights when defense counsel conceded his guilt in opening statement; 25) in denying appellant's motion to disqualify the judge; 26) in failing to conduct an adequate inquiry where appellant said he wanted to discharge counsel; 27) the death penalty statute is unconstitutional; 28) the aggravating circumstances are unconstitutional.
[5] We find the remainder of Besaraba's claims to be without merit.