# Supreme Court of Florida

_____

No. SC13-2
_____

**ROBERT LEE HOBART,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 30, 2015]

PER CURIAM.

Robert Lee Hobart, who was forty-one years old at the time of the crimes, was convicted of two counts of first-degree murder for the September 22, 2010, killings of Robert Hamm and Tracie Tolbert. A jury recommended that Hobart be sentenced to life in prison for the murder of Hamm and, by a vote of seven to five, that he be sentenced to death for the murder of Tolbert. The trial court subsequently followed the jury's recommendations, sentencing Hobart to life in prison without the possibility of parole for the murder of Hamm and to death for the murder of Tolbert.

This is Hobart's direct appeal of his convictions and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Hobart's convictions and sentences.

**FACTS**

Hobart was indicted and tried for the first-degree murders of Robert Hamm and Tracie Tolbert after DNA and ballistics evidence linked him to the murder weapon, his DNA was found on Tolbert's left arm, he could not be excluded as the contributor of hair discovered at the crime scene, and an investigation established that he had arranged a meeting with Hamm and Tolbert on the day of the murders to obtain drugs from them. Hobart initially admitted only to meeting with the victims but, in a conversation with a jailhouse informant while he was awaiting trial, stated that he had gotten into an argument with Hamm and shot him after Hamm struck him two or three times with a metal pipe. He also stated that he had then killed Tolbert because he was "all in" and "had to." However, he later recanted this story to the informant, claiming that he was "dope sick" and "needed to come up."

Hobart pled not guilty to the crimes charged and put forth a defense based on a reflexive rather than premeditated killing of Hamm, contending that he had shot Hamm in self-defense during an altercation in which Hamm attacked him with the metal pipe. Hobart also asserted that the State's theory of robbery, on the basis

of missing drugs and money, was insufficient because any robbery was an "afterthought."

Hobart had been addicted to Roxicodone, a form of oxycodone, since 1998, and he routinely purchased pills from Tolbert and Hamm, who was Tolbert's boyfriend. Both Hamm and Tolbert were involved in "doctor shopping," in which they would obtain medical prescriptions for pharmaceutical narcotics by going from doctor to doctor, fill the prescriptions at various pharmacies, and then sell the pills to others.

On the day of the murders, September 22, 2010, Hobart arranged to purchase Roxicodone pills from Tolbert at the Winn-Dixie grocery store parking lot near Hobart's house in Milton, Florida, once Tolbert had obtained the pills. That morning, Hamm and Tolbert drove to Milton to sell Lortab pills to Autumn Pare and her friend, Stev Vonaxelson. Pare testified that Tolbert had Lortab and Xanax pills and a large amount of money rolled in half, and either she or Vonaxelson purchased Lortab pills for $150. Vonaxelson testified that Hamm and Tolbert had arrived in a gold Ford Explorer SUV and that they left soon after for a doctor's appointment.

Around 9:30 a.m., Hamm and Tolbert arrived at Hobart's house, where they spoke with Hobart's mother and brother, Harold Hobart. Harold had assisted Hamm and Tolbert in obtaining pills several times before, providing money to pay

for the prescriptions and receiving pills in return. On this occasion, Harold drove Hamm and Tolbert to a doctor's appointment in Pace, Florida, in his own vehicle, a black Dodge truck, in order for them to obtain a prescription, then drove them to a pharmacy in Escambia County to fill Tolbert's prescription, and then back to the Hobart house in Milton at approximately 12 p.m. The police later found Tolbert's pharmacy receipts for 90 Roxicodone pills and 60 Soma pills from the pharmacy in Escambia County dated September 22, 2010, at 11:19 a.m., in Harold's truck. No Roxicodone pills were ever discovered.

Harold left town later that day but testified that he did not take any of the several firearms that he had in his unlocked bedroom with him. One of his firearms was a 9mm Taurus Millennium firearm. That firearm, which was later obtained by the police, was identified as the murder weapon based on ballistics evidence and tied to the defendant, Harold's brother Robert Hobart, based on DNA analysis of the grip and trigger.

After leaving the Hobart house around 12 p.m. in their own vehicle, the gold SUV, Hamm and Tolbert arrived at Sandra Bruton's house sometime between noon and 2 p.m. Bruton gave them $40 for two Roxicodone pills they were supposed to deliver to her later that day, but Hamm and Tolbert never returned.

Hobart initially claimed that he walked from his house on Saratoga Avenue in Milton and met Hamm and Tolbert by the Winn-Dixie grocery store at 1:30

p.m., bought two Roxicodone pills, and returned home for the rest of the day. He later admitted, however, that he got into their SUV and rode with them to a secluded area in Santa Rosa County in order to "shoot[] up pills."

At around 3:30 p.m., a witness named Lee Langham was driving on Jesse Allen Road in a rural area of Santa Rosa County when he saw two men on the side of the road looking under the hood of an SUV. A woman got into the SUV and appeared to be cranking it. When Langham was driving back down the road about five minutes later, he saw one man standing at the passenger side of the vehicle and saw the woman standing toward the back of the vehicle.

At approximately 4:30 p.m., Kenneth Owens and his wife were returning to their home on Jesse Allen Road when Owens noticed a pool of blood on the road. He stopped and, seeing a trail of blood, followed it to the bushes at the side of the road, where he discovered Tolbert's body. His wife called 911, and while verifying the location of the body for the 911 operator, Owens saw Hamm's body on the other side of the road in the storm water retention pond.

The medical examiner, Dr. Andrea Minyard, later established that Hamm died as a result of a gunshot wound to the back of his head from a shot fired from a distance of a foot or more, due to an absence of gunpowder residue, and that Tolbert died as a result of two gunshot wounds to the side of her head. Gunpowder residue indicated that the shots at Tolbert were fired from close range, one of

- 5 -

which went through the webbing of her left hand before entering her head. Both bodies had abrasions and cuts consistent with having been dragged across asphalt or through the woods but had no physical signs of injuries consistent with a struggle or fight.

DNA test results revealed that a DNA particle found on Tolbert's left arm was consistent with Hobart's partial DNA profile. Results were based on statistical analysis of five of the thirteen markers obtained, resulting in a combined frequency of occurrence for unrelated individuals of 1 in 32 for Caucasians, 1 in 51 for African-Americans, and 1 in 69 for southeastern Hispanics.

Based on a record check of Hamm's photo identification found in the wallet in his pocket, the police became aware that he drove a gold SUV. Several hours after the murders, while driving home from the crime scene, a police detective noticed a gold Ford Explorer SUV parked in the southwest corner of the Winn-Dixie parking lot in Milton. Blood was found on the center console, driver's seat, and running board, which DNA test results later confirmed to match that of Tolbert. The police found a purse on the front floorboard with a wallet containing Tolbert's driver's license. However, no money was found in the wallet or purse. A metal rod, a stick, and a shell casing were found in the front passenger's seat, and a projectile was found in the back driver's side seat.

At the crime scene on Jesse Allen Road, the police found a projectile, a shell casing, and a five-inch-long strand of hair in a spider web above the path through the bushes to Hamm's body. DNA test results later established that while Hamm and Tolbert could be excluded as contributors of DNA to the hair strand, Hobart and the medical examiner could not be excluded. The police determined that all the shell casings and projectiles found at the crime scene and in the vehicle were fired from Harold Hobart's 9mm Taurus Millennium firearm. DNA test results indicated that the defendant, Robert Hobart, was a major contributor to a partial DNA profile obtained from a single swab of both the firearm's grip and trigger.

On October 4, 2010, police officers conducted their first interview of Hobart, in which he stated that he met with Hamm and Tolbert on September 22 around 1 or 2 p.m. to buy two Roxicodone pills and then returned to his house for the rest of the day. On November 23, 2010, police officers conducted their second interview of Hobart, in which, upon reference to the ballistics and DNA evidence, Hobart denied having ever touched the firearm or having knowledge of any reason a strand of his hair could be at the crime scene or his DNA could be on Tolbert's arm. When asked whether it was a cold-blooded murder, he stated, "Well, I'm not going to incriminate myself, you know . . . I will say no. It was not, you know, it was not in cold blood."

Hobart was taken into custody, and, while awaiting trial, he was housed at the Santa Rosa County Jail with Vonaxelson, who had also been taken into custody for an unrelated crime. According to Vonaxelson's testimony at trial, Hobart recounted to him that he rode to Jesse Allen Road with Hamm and Tolbert in their vehicle to "shoot[] up pills," he got into an argument with Hamm about money Hamm allegedly owed Hobart's brother Harold, and Hamm struck him two or three times with a metal pipe. Hobart then told Vonaxelson that he shot Hamm twice in the chest, shot Tolbert as she sat in the driver's side of the vehicle, and then drove the vehicle back to Milton. When Vonaxelson asked why Hobart shot Tolbert, Hobart said he was "all in" and "had to." Vonaxelson further testified that a few days later, however, Hobart told him that he was "bullshitting" him, "like what he told [Vonaxelson] before, that didn't really happen, that he was dope sick and he needed to come up."

At the conclusion of the guilt phase of the trial, the jury found Hobart guilty by general verdict of two counts of first-degree murder for the murders of Hamm and Tolbert. The trial proceeded to the penalty phase, where Hobart presented the testimony of various family members and friends concerning his difficult childhood and history of substance abuse. Specifically, the testimony concerned his parents' lack of interest in taking care of him and his siblings. Family members also recounted that Hobart began smoking marijuana when he was eleven or

- 8 -

twelve years old and working as a roofer when he was fifteen or sixteen years old. Hobart subsequently lived with his aunt in Alabama, where he was not using drugs. However, when he moved back to Florida, he began using cocaine, heroin, and Roxicodone pills, with heavy use in the month leading up to these murders.

There also was extensive testimony from three mental health expert witnesses concerning the existence of statutory and nonstatutory mental health mitigation, specifically involving whether Hobart committed the murders while under the influence of an extreme mental disturbance. Dr. Kevin Groom, a clinical psychologist, testified for the defense that he reviewed Hobart's school, medical, and prison infirmary records; MRI and PET scan radiologist's reports; and interviewed Hobart's sisters and former girlfriend. Dr. Groom conducted a detailed interview with Hobart on his current and past symptoms, medical history, and academic and work history. Dr. Groom also administered neuropsychological tests.

Hobart achieved a full scale IQ score of 80, in the borderline intellectual functioning range. On the Stroop Color and Word Test, he performed poorly in the severely impaired range, and on the verbal learning test, he was well below average. On a three-question judgment test, he failed the first question, passed the second, and had partial results on the third. On the fine motor dexterity pegboard test, he was quite slow, but it was unclear whether this was due to a history of

fractured fingers or brain damage. On the Minnesota Multiphasic Personality Inventory test (MMPI)—a personality measure for psychopathology—Hobart demonstrated an elevated validity scale for infrequent responses. Dr. Groom opined that this result was due to Hobart's substance abuse, elevated levels of demoralization, low positive emotions, and antisocial behavior.

With regard to Hobart's medical history, Dr. Groom confirmed that Hobart had a family history of mood disorders, but no previous mental health treatment, and that Hobart was a long-term substance abuser, with increased substance abuse from 2006 to 2010. Dr. Groom also described the effects of opioid withdrawal—intensified pain and negative emotions, profound effects on dysphoria and depression, inability to sleep, and physiological distress. Prison infirmary records revealed recent mental health counseling and treatment with multiple psychotropic medications. However, the radiologist's MRI report revealed no acute inner cranial abnormality, and the PET report was normal.

Finally, Dr. Groom described three incidents from Hobart's life—falling from a tree, an assault in which he was beaten unconscious and temporarily lost his memory, and a car accident—which, in addition to opioid abuse, he opined were "enough brain insults to create a problem for some people." According to Dr. Groom, "[i]t's not a one-to-one. I can't say for sure that . . . any one of these has given rise to a pattern of current brain damage that is significant, but . . . it's

something that I think we should consider." Dr. Groom, however, stated that he could not say what effect Hobart's cognitive deficits had on the double homicide of Hamm and Tolbert.

Next, Dr. Alan Waldman, a neuropsychiatrist, testified for the defense that he performed a standard neuropsychiatric evaluation by reviewing Hobart's psychiatric care, medical care, and social history, including his substance abuse, head injuries, and neurological insult history. He then performed a higher cortical function examination and found that Hobart had some memory deficits and significant frontal lobe abnormalities. Based on the results, he ordered MRI and PET scans and personally reviewed the scans. He also reviewed the radiologist's MRI report, which showed no acute inner cranial abnormality. Dr. Waldman examined the actual scan himself and found that Hobart had brain substance death and "abnormally large sylvian sulcus and rolandic sulcus" in the frontal and temporal lobes of the brain. Dr. Waldman diagnosed Hobart with substance-induced persisting dementia and a cognitive disorder not otherwise specified or mild neurocognitive disorder. He further explained that mild neurocognitive disorder means that the frontal lobes and memory do not function properly and IQ score is in the borderline range of intellectual functioning, which was consistent with Dr. Groom's findings.

Dr. Waldman stated, "In my opinion it is within medical certainty that at the time of the crimes, Hobart was suffering from extreme emotional difficulties because he is a brain-damaged individual that cannot take a situation, weigh out the options, know the right options. He works on impulses because he has a broken brain." Dr. Waldman further stated that he was able to make this determination without knowing the specific facts of the crime, except for the medical examiner's report that specified the manner of death, "because of the nature of [his] findings, the MRI scan and the fact that this man has a broken brain and cannot navigate the world like the rest of us can." In conclusion, Dr. Waldman stated that the frontal lobes of the brain are responsible for rational thinking and affect a person's ability to react in conditions of extreme stress, and "that's the part of [Hobart's] brain that has the most injury, so I can't say that he rationally did anything."

Lastly, Dr. Brett Wayne Turner, a clinical psychologist, testified for the State. He reviewed the police reports, videos, and State's evidence in this case; Dr. Waldman's test results; and the radiologist's MRI report to make his determinations. He stated that he relied on Dr. Groom's test results and raw data, which he agreed were interpreted correctly. Dr. Turner met with Hobart two days before the penalty-phase proceedings for just over one hour. He conducted a clinical interview to discuss Hobart's background, a mental status exam, and a few

portions of mental state exams, with a couple of very brief memory tests. He did not interview Hobart's family members or friends, but observed their testimony during the trial proceedings.

Dr. Turner stated that Hobart recounted that he enjoyed playing games of poker and rummy with other inmates, which Hobart stated he won. Dr. Turner next explained that poker is a very complex game involving bluffing that requires frontal lobe functions, and if frontal lobe functions are impaired, then playing poker would be difficult. He opined that if Hobart does have a traumatic brain injury, then it is very minimal, and that he did not meet the criteria for substance-induced dementia.

When asked to opine as to whether Hobart committed the murders while under the influence of an extreme mental or emotional disturbance, Dr. Turner testified that there was no evidence of that mitigator. He stated that the facts in the case, including an attempt by Hobart to cover his tracks, indicate forward thinking and planning, which are frontal lobe functions. However, he agreed that the statutory mitigator of extreme mental or emotional disturbance could be found without knowing the facts of the case.

Dr. Turner also testified that he did not believe that Hobart's reasoning was impaired, despite indications that Hobart was on drugs the day of the murders. He explained that "drugs may have affected his reasoning to some degree," stating that

"for people who are addicted to opiates, their brain actually functions more normally when they're on drugs rather than when they're off the drug . . . . It's when they're off the medication that the brain functioning is less than normal."

At the close of penalty-phase proceedings, the jury recommended a sentence of life without the possibility of parole for the murder of Hamm and, by a vote of seven to five, a sentence of death for the murder of Tolbert. In following these recommendations in sentencing Hobart, the trial court found the following two aggravating circumstances with respect to the murder of Tolbert, both of which it assigned great weight: (1) Hobart was convicted of another felony involving the use or threat of violence to another person, and (2) the murder was committed while Hobart was engaged in the commission of a robbery. The trial court rejected the sole asserted statutory mitigating circumstance that the murder was committed while Hobart was under the influence of an extreme mental or emotional disturbance. However, the trial court did find fifteen nonstatutory mitigating circumstances.[1] In conclusion, the trial court determined that the aggravating

_____

1. The fifteen nonstatutory mitigating circumstances found by the trial court and the weights assigned to each were as follows: (1) Hobart's parents had a dysfunctional marriage (slight weight); (2) Hobart suffered physical abuse (slight weight); (3) Hobart suffered from substance abuse/dependency (moderate weight); (4) Hobart has a low IQ (moderate weight); (5) Hobart is a good roofer (slight weight); (6) Hobart did not receive encouragement from his father (somewhat mitigating—slight weight); (7) Hobart was neglected by his custodial parents (slight weight); (8) Hobart exhibited good courtroom behavior during trial (slight weight); (9) Hobart is capable of strong, loving relationships (slight weight); (10)

circumstances outweighed the mitigating circumstances and sentenced Hobart to death for the murder of Tolbert. This appeal followed.

## ANALYSIS

On direct appeal, Hobart raises the following claims: (1) the evidence is legally insufficient to support the conviction for first-degree murder in the death of Hamm; (2) the trial court erred in instructing the jury on and finding the statutory aggravating circumstance that Hobart committed the murder of Tolbert during a robbery; (3) the trial court erred in rejecting the statutory mitigating circumstance that Hobart committed the murder of Tolbert while under the influence of an extreme mental or emotional disturbance; (4) the death penalty is not proportionate in this case; and (5) Hobart's death sentence is unconstitutional based on Ring v. Arizona, 536 U.S. 584 (2002). We address each claim in turn.

### I. Sufficiency of the Evidence

In his first claim on appeal, Hobart challenges the sufficiency of the evidence of premeditation and robbery for the conviction of first-degree murder in the death of Hamm. Specifically, he asserts that the trial court erred in denying his

---

Hobart has a special bond with his children (slight weight); (11) Hobart, when not on drugs, has been a good son, brother, uncle, father, etc. (slight weight); (12) Hobart has a family that loves him very much (slight weight); (13) Hobart has a history of mild traumatic brain injury (slight weight); (14) Hobart has neuropsychological deficits (slight weight); and (15) Hobart has brain damage (slight weight).

motion for judgment of acquittal with respect to the murder of Hamm because the evidence does not contradict his theory that he shot Hamm reflexively after Hamm attacked him with a metal pipe, nor does the evidence establish that the motive for the murder was robbery because any alleged taking of property occurred after the murder.

Hobart does not, however, challenge the sufficiency of the evidence in support of his conviction for murdering Tolbert—the conviction for which the trial court sentenced him to death. Nevertheless, this Court has a mandatory obligation to review the sufficiency of the evidence in any case in which a sentence of death has been imposed, even when not challenged. See Gregory v. State, 118 So. 3d 770, 785 (Fla. 2013).

After review of the underlying basis for both convictions, we conclude that Hobart's claim is without merit and that sufficient evidence exists to support both of Hobart's first-degree murder convictions under either a premeditated or felony murder theory.

### A. Standard of Review

"A trial court should not grant a motion for judgment of acquittal 'unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.' " Jackson v. State, 25 So. 3d 518, 531 (Fla. 2009) (quoting Coday v. State, 946 So. 2d 988, 996 (Fla. 2006)). "In

reviewing the denial of a motion for judgment of acquittal, appellate courts apply a de novo standard of review and do not reverse a conviction where the conviction is supported by competent, substantial evidence." Id. "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)). "A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." Crain v. State, 894 So. 2d 59, 73 (Fla. 2004).

We first address the sufficiency of the evidence in support of the conviction for the murder of Tolbert, for which Hobart received the death sentence, and then proceed to address Hobart's claim related to the evidence underlying his conviction for the murder of Hamm.

### B. Murder of Tolbert

Hobart arranged to meet with Tolbert to purchase drugs on the day of the murders, and he was seen with the victims in a secluded location on Jesse Allen Road shortly before the bodies were discovered there. Hobart's DNA was found on the grip and trigger of the murder weapon, which belonged to his brother, as

well as on Tolbert's left arm, and he could not be excluded as the source of hair found at the crime scene.

Numerous facts support premeditation as to the murder of Tolbert. First, even though Hobart had routinely purchased drugs from the victims and there was no evidence of any history of provocation or altercation between them, Hobart brought a firearm to the meeting. Second, in his statements to Vonaxelson, Hobart explained that he killed Tolbert because he was "all in" and "had to" after killing Hamm. Finally, Tolbert was shot twice to the side of her head at point-blank range. See Baker v. State, 71 So. 3d 802, 824 (Fla. 2011) (holding that a fatal gunshot delivered in close proximity to the victim's forehead supported a conclusion that the murder was intentional and premeditated, rather than reckless or accidental). Accordingly, we hold that there is competent, substantial evidence to affirm Hobart's conviction for the first-degree murder of Tolbert under a premeditated murder theory.

There is, in addition, competent, substantial evidence to support the conviction under a felony murder theory. Although Hobart asserts that any robbery was an "afterthought," Hobart knew Tolbert was in possession of Roxicodone, and testimony established that Tolbert was seen with a large amount of money earlier in the day. After the murders, no money or Roxicodone were ever discovered. As the trial court stated, "[b]ased on the entire circumstances of

the incident, . . . no other motive for the murder appears from the record other than robbery."

For these reasons, we affirm Hobart's conviction for the first-degree murder of Tolbert.

### C. Murder of Hamm

Unlike the murder of Tolbert, Hobart specifically argues that the evidence was insufficient to support premeditation as to the murder of Hamm. We reject this claim.

First, although Hobart claims that the discovery of a metal pipe and a knife suggests that Hobart brought the firearm to defend himself, there is no evidence to support that conclusion. However, even if Hobart did bring the firearm to the encounter with the idea that he might have to defend himself, the evidence does not support his claim that he acted in self-defense.

In fact, the metal pipe alleged by Hobart to have been used by Hamm to attack him was found inside the vehicle and not outside, as would be consistent had it been used in a fight alleged to have occurred outside of the vehicle. Further, Hamm's knife was found in his back pocket, indicating that it had not been used in a physical fight or in self-defense to a deadly threat to his life.

The nature and manner of Hamm's wounds also support premeditation. Specifically, Hamm was shot in the back of the head. Hamm was not, as Hobart

originally claimed in his statements to Vonaxelson, shot in the chest during an altercation.

Accordingly, we hold that there is competent, substantial evidence of premeditation to support Hobart's conviction for first-degree murder in the death of Hamm. However, even if we were to conclude that the evidence of premeditation was insufficient, we would still conclude that Hobart's conviction for the first-degree murder of Hamm must be affirmed under a felony murder theory, for the same reasons set forth with respect to the murder of Tolbert.

## II. Trial Court's Findings on Aggravators and Mitigators

Hobart next challenges two of the trial court's findings with respect to aggravating and mitigating circumstances. Specifically, Hobart contends that the trial court erroneously instructed the jury on and found the in-course-of-robbery aggravator and erroneously rejected the statutory mitigating circumstance that the murder was committed while under the influence of an extreme mental or emotional disturbance. We address each of these claims in turn.

## A. In-Course-of-Robbery Aggravator

In this claim, Hobart argues that the trial court erred in instructing the jury on and in finding the aggravating circumstance that he committed the murder of Tolbert during a robbery. Specifically, he asserts that the evidence is equally

consistent with his story that he killed Hamm "reflexively" as Hamm attacked him with a metal pipe and that he took any items only as an afterthought. We disagree.

"The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence." Guardado v. State, 965 So. 2d 108, 115 (Fla. 2007). As we have already explained with respect to the evidence in support of the conviction for felony murder with an underlying felony of robbery, there is competent, substantial evidence to support the trial court's finding that robbery was the motive for the murders. Hobart, who was addicted to Roxicodone, knew that the victims were in possession of a substantial amount of Roxicodone, and the victims had also been seen earlier that day with a large sum of money. During the investigation of the crime scene and the SUV, no Roxicodone or money was ever discovered. Accordingly, we conclude that the trial court did not err in instructing the jury on and finding as an aggravating circumstance that Hobart committed the murder of Tolbert during a robbery.

### B. Extreme Mental or Emotional Disturbance Mitigator

Next, Hobart contends that the trial court erred by rejecting the statutory mitigating circumstance that he committed the murder of Tolbert while under the influence of an extreme mental or emotional disturbance. Trial courts must

observe the following standards when evaluating mitigating circumstances during capital sentencing:

> A trial court must find as a mitigating circumstance each proposed factor that has been established by the greater weight of the evidence and that is truly mitigating in nature. However, a trial court may reject a proposed mitigator if the mitigator is not proven or if there is competent, substantial evidence to support its rejection. Even expert opinion evidence may be rejected if that evidence cannot be reconciled with the other evidence in the case.

Coday, 946 So. 2d at 1003.

We conclude that the trial court's decision to reject the statutory mitigating circumstance is supported by competent, substantial evidence in the record. During the penalty phase, multiple mental health professionals testified as expert witnesses. While each expert testified that Hobart suffered from some form of mental illness, the expert opinions as to the severity of the mental illness and the effect of that mental illness on Hobart's mental state at the time of the murders varied widely.

In its written sentencing order, the trial court analyzed the expert testimony elicited during trial, but expressly noted that "there was no testimony from anyone . . . as to [Hobart's] mental or emotional condition on the day of the murders." Further, the trial court noted that according to Dr. Groom, "no acute abnormality was detected on the MRI and the PET scan was normal," and Dr. Groom "admitted that he did not know the cause of [Hobart's] deficits or how his deficits caused him

- 22 -

to commit the murders." Continuing, the trial court noted that Dr. Waldman "admitted that he did not know the details of the murders or what [Hobart] was doing on the day of the murders or [Hobart's] actions after the murders."

Dr. Turner, unlike Drs. Groom and Waldman, was familiar with the facts of the case and testified that, in his opinion, Hobart "was not under the influence of extreme mental or emotional disturbance when he committed the murders." Even though Dr. Turner explained that Hobart may have some frontal lobe damage, it was minimal because Hobart could undertake other activities that would be difficult with this impairment. The trial court rejected this mitigator, noting that the evidence also indicates that Hobart was able to work as a roofer, maintain relationships with his family members and friends, provide financial support for his children, and engage in most of the activities of everyday living. The trial court found "the opinion of Dr. Turner to be more credible than the opinions of Dr. Waldman and Dr. Groom" and that "the mitigating circumstance of extreme mental or emotional disturbance had not been established by the evidence."

While Hobart challenges the credibility of Dr. Turner's findings, the trial court is in the best position to judge witness credibility. See Evans v. State, 975 So. 2d 1035, 1049 (Fla. 2007) (explaining that the trial court is in a superior position "to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor, and credibility of the witnesses" (citations

omitted)).  Here, the trial court gave credence and great weight to Dr. Turner's testimony.  This Court has stated that when "experts disagree, the trier of fact is entitled to resolve the resulting factual issue," and "[q]uestions relating to evidentiary weight are within the province of the [trial] court, and this Court will not reweigh the evidence on appeal."  Merck v. State, 975 So. 2d 1054, 1065 (Fla. 2007).

Despite suffering some mental impairment, Hobart's forward-thinking actions—arranging a meeting with the victims, procuring a firearm, shooting Tolbert in an execution-style manner, concealing the bodies, and driving and then abandoning the vehicle—do not indicate that Hobart committed the murders while under the influence of an extreme mental or emotional disturbance.  Instead, there is competent, substantial evidence in the record to support the trial court's finding that Hobart was fully cognizant of his actions during the murder, and that his substance abuse and brain damage, if any, did not interfere with his ability to plan and commit these crimes.  Accordingly, we reject this claim.

### III.  Proportionality

In his next claim, Hobart contends that death is a disproportionate punishment in this case.  He asserts that the circumstances of the crime and the existence of substantial mental health mitigation render the death sentence not proportionate to other cases in which the death penalty has been upheld.  In making

this argument, however, Hobart places great weight on the claim that the in-course-of-robbery aggravator was improperly found—a claim we have rejected.

In its sentencing order, the trial court found the following two aggravating circumstances in the murder of Tolbert, both of which it assigned great weight: (1) Hobart was convicted of another felony involving the use or threat of violence to another person; and (2) the murder was committed while Hobart was engaged in the commission of a robbery. The trial court's finding of the prior violent felony aggravator was based on Hobart's contemporaneous conviction for murder and a certified copy of Hobart's conviction for aggravated battery on November 30, 1989, the details of which were not discussed during the penalty-phase proceedings.

Although the trial court expressly rejected the sole statutory mitigating circumstance that Hobart committed the murder while under the influence of an extreme mental or emotional disturbance, the trial court found that the evidence supported several nonstatutory mental health mitigating circumstances, including that Hobart suffered from substance abuse/dependency (moderate weight) and has a low IQ (moderate weight), history of mild traumatic brain injury (slight weight), neuropsychological deficits (slight weight), and brain damage (slight weight).

Hobart relies on Besaraba v. State, 656 So. 2d 441 (Fla. 1995), and Knowles v. State, 632 So. 2d 62 (Fla. 1993), in which we vacated the death sentences as

disproportionate, to support his assertion that the death penalty is not proportionate in this case. However, the mental health mitigation in those cases is not analogous to Hobart's mitigation.

In Besaraba, the defendant presented vast mitigation evidence and a documented medical history of "moderate to serious memory problems; paranoid tendencies; organic brain damage; hospital treatment for numerous physical and mental conditions; psychotic or paranoid behavior; alcohol counseling; and delirium." 656 So. 2d at 442. In Knowles, the defendant presented extensive uncontroverted evidence of extreme intoxication at the time of the murders, and due to this intoxication, was in an acute psychotic state causing him to be confused, irrational, impulsive, and unable to remember the events that transpired, which both the defense and State expert witnesses agreed impaired his ability to premeditate. 632 So. 2d at 67. These cases are therefore distinguishable.

On the other hand, this Court has upheld the death penalty as proportionate in several cases that are more factually similar and qualitatively comparable to this case. In Lebron v. State, 982 So. 2d 649, 669 (Fla. 2008), we upheld the death sentence as proportionate with similar aggravators of prior violent felony and commission during a robbery and similar "nonstatutory mitigators [including family, emotional, and mental health problems] that were not compelling." In Freeman v. State, 563 So. 2d 73, 76-77 (Fla. 1990), and Melton v. State, 638 So.

2d 927, 930-31 (Fla. 1994), we upheld the death sentences as proportionate where in each case the defendant killed the victim during a burglary, and, similar to this case, the trial court found two statutory aggravating factors—the murder was committed during a felony and the defendant had been convicted of another murder—and no statutory mitigating factors.

Accordingly, we conclude that Hobart's death sentence is proportionate and reject this claim.

## IV. Ring Claim

In his final claim, Hobart argues that his death sentence is unconstitutional based on the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002). However, this claim is without merit under our precedent because one of the aggravators found by the trial court was the prior violent felony involving the contemporaneous murder of Hamm and the conviction for aggravated battery. See, e.g., McCoy v. State, 132 So. 3d 756, 775-76 (Fla. 2013) (explaining that Ring is not implicated in cases involving the prior violent felony aggravator), cert. denied, 135 S. Ct. 90 (2014); Johnson v. State, 104 So. 3d 1010, 1028 (Fla. 2012) (stating that this Court has repeatedly rejected Ring claims where the prior violent felony aggravator has been found).

We acknowledge that the United States Supreme Court has granted certiorari to review our decision in Hurst v. State, 147 So. 3d 435 (Fla. 2014), cert. granted,

Hurst v. Florida, 135 S. Ct. 1531 (2015). In its order accepting review, the Supreme Court framed the question to be addressed in Hurst as follows: "Whether Florida's death sentencing scheme violates the Sixth Amendment or the Eighth Amendment in light of this Court's decision in Ring v. Arizona, 536 U.S. 584 (2002)." 135 S. Ct. at 1531. We also acknowledge that the jury recommended death by a bare majority vote of seven to five in this case. Unlike this case, however, Hurst did not involve the prior violent felony aggravator, which this Court's precedent clearly establishes does not implicate Ring. Accordingly, until the Supreme Court issues a contrary decision, Hobart's claim is without merit under established Florida precedent.

## CONCLUSION

For the reasons set forth in this opinion, we affirm Hobart's convictions and sentences.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Santa Rosa County,
    David Harold Rimmer, Judge - Case No. 572010CF001478XXAXMX

- 28 -

Nancy Ann Daniels, Public Defender, and Nada Margaret Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Katherine Yzquierdo McIntire, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee